**UNITED STATES of America**
v.
**Lowell M. BIRRELL, Defendant.**
No. 61 Cr. 692.

United States District Court
S. D. New York.
May 23, 1967.

See also D.C., 266 F.Supp. 539.

Robert M. Morgenthau, U. S. Atty., S. Dist. of New York, for the United States; Arthur L. Liman, Sp. Asst. U. S. Atty., and Stephen L. Hammerman, Asst. U. S. Atty., of counsel.

William J. Brennan, III, New York City, for defendant, Lowell M. Birrell.

## OPINION

HERLANDS, District Judge:

Two pretrial motions by defendant Lowell M. Birrell raise novel and challenging questions about the nature and scope of the procedures to be followed after a defendant's successful application to suppress illegally seized evidence.

One problem concerns the inventory of the seized items to be prepared by the Government subsequent to the illegal seizure under an invalid search warrant. The other relates to the character and timing of an evidential hearing to determine whether the Government's trial evidence is or will be absolutely free from the taint of the illegally seized evidence which has been ordered suppressed.

Defendant applies for:

(1) "an order, pursuant to Rule 41(d) of the Federal Rules of Criminal Procedure and the Fourth, Fifth and Sixth Amendments to the Constitution of the United States, directing the United States Attorney to file an inventory of the property which the Government seized from defendant Lowell M. Birrell on August 22 and 24, 1959 with the Clerk of this Court; to deliver to his attorney a

copy thereof, as well as a receipt for all property taken, and otherwise duly to comply with the requirements of said Rule 41(d) of the Federal Rules of Criminal Procedure"; and

(2) "an order, pursuant to Rules 12 (b) (1) and (4) and 41(e), Federal Rules of Criminal Procedure and the Fourth, Fifth and Sixth Amendments to the Constitution of the United States, directing that a hearing be held, prior to the trial of the defendant herein, at which the United States will be required to prove beyond a reasonable doubt, that the evidence which it intends to introduce against the defendant at his trial is untainted by the evidence unlawfully seized from the defendant on August 22 and 24, 1959, which this Court ordered suppressed on June 11, 1965."

The pertinent facts and circumstances revolve around a vast quantity of documentary records which were seized on August 22 and 24, 1959 in the Eastern District of Pennsylvania, placed in the custody of this Court in November, 1959, and suppressed as evidence by order of Judge Wyatt of this Court on June 11, 1965.

The odyssey of the records began on August 20, 1959, when information about their location became known at an ancillary proceeding in bankruptcy pending in this Court. On the basis of an affidavit of one of the attorneys in that proceeding, a search warrant issued on August 22, 1959. A second search warrant issued on August 24, 1959 supported by an affidavit of a postal inspector. Each warrant was executed and returned on its issue date.

Accompanying each return was an inventory of the property seized which was prepared by the Deputy Marshal who executed the warrant. The exact language of the description of property in the warrant and of the Deputy Marshal's inventory are set out in the margin.[1] It may be seen that the description in the warrant is exceedingly broad, and the wording of the inventory is similarly lacking in specificity. The two searches

---

1. The description of property contained in the search warrant dated August 22, 1959 reads as follows:
    "correspondence, memoranda, Minute Books, Journals, Cash Books, Cancelled checks, Books of Original Entry and other records contained in approximately twenty-four (24) filing cabinets, concerning companies, corporations, businesses, firms and individuals set forth on the attached list made a part of this Search Warrant and Affidavit, for the period from January 1, 1953, to the present date." (The "attached list" referred to is a list of 178 companies, corporations, businesses, firms and individuals, followed by the statement: "and any other company, corporation, business, firm or individual with whom Lowell M. Birrell has been associated.")
    The description of property contained in the second search warrant, dated August 24, 1959, is identical to the description in the earlier warrant except that the number of filing cabinets is stated to be "approximately twenty (20)."
    The inventory accompanying the return of the warrant dated August 22, 1959 reads as follows:
    "Known as Lot #1. Consisting of twenty-one (21) metal and/or wooden file cabinets containing four (4) draw-

ers. Each drawer containing files, records, information relevant to appended sheet on search warrant and numbered consecutively from one (1) to eighty-four (84) and thirteen independent cabinets containing files, records and information relevant to appended sheet of search warrant and numbered consecutively from eighty-five (85) to ninety-seven (97) inclusive. Also six (6) cardboard cartons containing files, records and information relevant to appended sheet of search warrant and numbered consecutively carton Number One (1) to Carton Number six (6) inclusive. Also one (1) strongbox locked."
    The inventory accompanying the return of the second search warrant, dated August 24, 1959, reads as follows:
    "Known as Lot #2. Consisting of 21 metal and/or wooden file cabinets, containing four drawers each, one (1) metal file cabinet containing five (5) drawers, one (1) wood bureau containing four (4) drawers, each drawer containing files, records and information relevant to the appended sheets attached to this search warrant and numbered consecutively from one (1) to ninety-three (93) inclusive."

netted a total of more than fifty file cabinets and cartons of records. The number of individual documents is said to be between one and two million.

From late 1959 until July 1961, the records were kept in the custody of the Clerk of this Court. Attorneys in the above-mentioned bankruptcy proceeding and representatives of several government agencies were authorized to inspect and obtain photocopies of the records. The files of the Clerk's office show that various attorneys involved in the bankruptcy proceeding inspected the records, as well as representatives of the Attorney-General of the State of California and the District Attorney for the City of Los Angeles.

In July 1961, with the permission of Judge Palmieri of this Court, the records were moved from a file room of the Clerk's office to a file room of the United States Attorney's office. Representatives of that office, with the aid of investigators from the Securities and Exchange Commission, commenced an inspection and inventory of the records.

Late in 1964—more than five years after the records had been seized—defendant moved for their suppression and return. Finding that the affidavits underlying the warrants were insufficient to establish probable cause, Judge Wyatt ordered the seized property suppressed for use as evidence against the defendant. 242 F.Supp. 191, 201 (1965). By a subsequent order, Birrell was adjudged entitled to the return of these records belonging to him upon proof of ownership. 243 F.Supp. 38, 41 (1965).

For two periods in 1965—one prior to and the other subsequent to the suppression order—Birrell was authorized by court order to inspect the seized property. Both orders incorporated provisions for an extension of time, which were never invoked.

Copies of the inventory compiled by the United States Attorney's office were furnished to Birrell's defense counsel on February 10, 1967 and filed * with the Court. This work product inventory is selectively detailed and amounts to 300 pages. In addition, the Government has submitted, in opposition to defendant's motion, a set of affidavits which purports to demonstrate that the seized records had been kept intact from the time of the seizure until the compilation of the Government's inventory. Defendant, however, strongly disputes the sufficiency of the Government's proof on this point.

## I. MOTION FOR AN INVENTORY

Defendant contends that:

(1) the provision for an inventory contained in Fed.R.Crim.P. 41(d) is mandatory and has not been satisfied; and

(2) identification of all of the property originally seized is constitutionally compelled to (a) define the scope of the suppression order, (b) establish that all of the seized property has been made available to defendant, and (c) provide the Court with a sufficient basis to determine whether the Government has met its burden of proving the purity of its trial evidence.

In the event that the Government fails to identify and make available all of the seized evidence, defendant contends that he cannot constitutionally be tried and, therefore, the indictment must be dismissed.

The Government, on the other hand, argues that:

(1) the inventories which accompanied the return of the warrants were proper and sufficient inventories under Rule 41(d);

(2) even if the Deputy Marshal's inventories did not comport with the requirements of Rule 41(d), any deficiency was cured by (a) delivery to defense counsel on February 10, 1967 of the Government's work product inventory, and (b) the orders granting Birrell access to the files, suppression of their use as evi-

* The Court will hear counsel as to whether the inventory should be impounded except as to the defense herein.

dence against him, and the right to recover whatever documents may be his; and

(3) in any event, non-compliance by the Government with the inventory requirements of Rule 41(d) does not—under the Constitution or any pertinent statute, rule or decision—immunize a defendant from further criminal prosecution.

The Court now turns to an analysis of the issues. The sufficiency of the inventory required under Rule 41(d)—undefined by statute or rule—apparently has not heretofore received attention in the published reports. While the language of the rule suggests that the preparation of a proper inventory is mandatory, the weight of authority supports the conclusion that it is a ministerial act, a failure of which will not affect the validity of the underlying search,[2] much less immunize the defendant from further prosecution.

Nevertheless, the Court is not powerless to fashion a remedy when the requirements of Rule 41(d) have been ignored. Indeed, on one occasion when no inventory had been prepared, this Court ordered the Government to file an inventory under pain of having the seized evidence suppressed. It was noted then that "to sanction non-compliance with the statute would result in nullifying its purpose." United States v. Gross, 137 F.Supp. 244, 248 (S.D.N.Y.1956) (Weinfeld, J.).

In the instant case, of course, defendant already has secured suppression of the seized evidence, and has established his right to the return of all property to which he is entitled. In these circumstances, perhaps defendant has no further remedy. What purpose can be served in coercing the Government to follow the specified procedure of Rule 41(d)—if it has not already done so—when the search has been held unlawful on other grounds? Nevertheless, it may well be that in such circumstances the trial court has residual discretion under Rule 41(d) to order an inventory or a supplemental inventory when justice so requires.

In the instant case, however, we need not reach this question. Assuming that power to direct an inventory survives the suppression order, the Court perceives no reason for its exercise under the present circumstances. The invocation of such power at this particular juncture would neither vindicate the policy underlying the inventory requirement nor serve the universal interest in expeditious and impartial justice.

Neither the language nor the legislative history of Rule 41(d) [3] elucidates the nature of the inventory requirement.

Various semantic arguments may be contrived by comparing the language of the present rule with that of its prede-

---

**2.** A number of decisions supporting this proposition are gathered in footnote 11 of United States v. Gross, 137 F.Supp. 244 at 248 (S.D.N.Y.1956). One more recent example is United States v. Haskins, 345 F.2d 111, 117 (6th Cir. 1965).

**3.** Rule 41(d) reads as follows:
"(d) *Execution and Return with Inventory.*
The warrant may be executed and returned only within 10 days after its date. The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken or a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the applicant for the warrant or the person from whose possession or premises the property was taken, and shall be verified by the officer. The judge or commissioner shall upon request deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant."

cessor provisions.[4] But a critique of those arguments would contribute little toward an evaluation of the legislative intent. Inquiry into the purpose underlying the inventory requirement of Rule 41(d) must rest primarily on an analysis of the internal consistency of the subdivisions of Rule 41 and on a harmonization of the rule with other provisions of law.

Subdivision (c) of Rule 41 authorizes the issuance of a search warrant "identifying the property" which is the subject of the search. Subdivision (d) requires an inventory to be made in the presence of two witnesses[5] and to be verified by the officer executing the warrant. Subdivision (e) provides that an aggrieved party may move for suppression and return on the ground, *inter alia,* that "the property seized is not that described in the warrant." Finally, subdivision (f) provides for the filing with the Court of the warrant, return and inventory.

The inventory requirement, itself applies only to a search conducted on the basis of a warrant. There appears to be no requirement of an inventory when property is seized without a search warrant.[6]

The ostensible purpose of the inventory requirement, suggested by this statutory scheme, is to enable the Court to determine—on the face of the warrant, return and inventory—whether the seizure was properly limited to the property identified in the warrant. In the instant case, the seizure in question already has been invalidated on other grounds. Consequently, there is here no need to vindicate the policy which appears to underly the inventory provision.

Sidestepping the thrust of this policy analysis, defendant took the position at oral argument that the Government should not be permitted to compound its failure of specificity in the warrant with a like failure of specificity in the inventory. The surface appeal of this contention must be probed. This Court's authority is properly limited to the interpretation and application of law in light of controlling policy. Unless a meaningful purpose can be served by granting defendant the relief he now requests, the Government's alleged dereliction need not be visited with punitive action simply for the sake of retribution.

Defendant does indeed contend that another purpose is served by the requirement of an inventory—namely, the iden-

---

4. The Advisory Committee note to Rule 41 indicates that subdivision (d) is a restatement of former Sections 621–624 of Title 18 of the United States Code.

    "§ 621. Time for execution and return of warrant. A search warrant must be executed and returned to the judge or commissioner who issued it within ten days after its date; after the expiration of this time the warrant, unless executed, is void."

    "§ 622. Copy of warrant and receipt for property taken to person from whom taken. When the officer takes property under the warrant, he must give a copy of the warrant together with a receipt for the property taken (specifying it in detail) to the person from whom it was taken by him, or in whose possession it was found; or, in the absence of any person, he must leave it in the place where he found the property."

    "§ 623. Return; contents. The officer must forthwith return the warrant to the judge or commissioner and

deliver to him a written inventory of the property taken, made publicly or in the presence of the person from whose possession it was taken, and of the applicant for the warrant, if they are present, verified by the affidavit of the officer at the foot of the inventory and taken before the judge or commissioner at the time, to the following effect: 'I, R. S., the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of all the property taken by me on the warrant.' "

    "§ 624. Copy of inventory for person from whom property taken. The judge or commissioner must thereupon, if required, deliver a copy of the inventory to the person from whose possession the property was taken and to the applicant for the warrant."

5. See note 3, supra.

6. Cf. Fed.R.Crim.P. 41(g); 18 U.S.C. § 2236.

tification of the seized property in the event of its suppression. In view of the magnitude of the seizure and the Government's access to the suppressed records, defendant asserts that he cannot effectively challenge the Government's proof that its trial evidence is uncontaminated by the unlawful seizure unless all of the property originally seized is identified by a detailed inventory.

Referring again to the fact that an inventory is required only when the search and seizure is conducted by authority of a warrant, the Court regards the alternative purpose suggested as no more than an incidental one served by the inventory provision only when a warrant has been obtained. In any event, nothing short of a document-by-document inventory would seem to satisfy this alleged purpose. If the inventory were to be truly useful in identifying each and every document, its description of each item would have to be quite detailed. In light of the explicit requirement for prompt filing,[7] such specificity and particularization would not seem to be called for even under an extreme construction of Rule 41 (d).

Accepting defendant's representation that the number of individual documents is between one and two million, an inventory sufficiently detailed to meet his request might cover as many as 100,000 pages. It scarcely can be believed that such an unwieldy, encyclopedic inventory would be more useful to the defendant than the selectively detailed Government work product inventory already furnished. When the marginal utility of the desired inventory is weighed against the enormous expenditure in time and effort that would be needed to prepare it,[8] and the resulting substantial further delay before trial, the balance leans heavily on the side of denying defendant's motion. Without attempting to assess the relative

responsibility for the delays thus far encountered in bringing this 1961 indictment to trial, the Court is of the opinion that further delay—unless unavoidable—should be obviated. Cf. United States v. McIntyre, 375 F.2d 127 (2d Cir. 1967).

A salient circumstance is that the seized property represents defendant's own files and other files allegedly within his possession. While the records are voluminous, surely defendant is in a better position than anyone else to know what documents may be incriminatory or may be useful to the Government in securing incriminating evidence. In any event, he now has a copy of the Government's own inventory; and examination of that inventory would most significantly suggest what the Government thought was relevant. Moreover, it is undisputed that defendant has not been denied access to the records since the seizure; and he will remain free to inspect them through to the conclusion of these proceedings upon application to the Court.

Pointing to the fact that various Government agencies and others have had access to the seized records over a number of years, defendant challenges the Government claim that the seized records have remained intact. Obviously fearful that fruit of the poisonous tree—or a branch of the tree itself—may be introduced into evidence, inadvertently or otherwise, he asserts that only by being provided with an inventory which speaks as of the date of seizure can his rights be protected. Aware of defendant's sensitive concern, the Court nevertheless does not understand how an inventory to be prepared in the future might be used effectively to guard against this hypothesized contingency.

Furthermore, absent some showing of bad faith on the Government's part, it ill becomes defendant to stress a general-

---

7. Under Rule 41(d), the inventory must accompany the return of the warrant, and the warrant must be returned within 10 days of its issuance. See note 3, supra.

8. The Government has estimated that compilation of an inventory meeting defendant's specifications would require roughly 25,000 man-hours. The calculations appear in the Government's Memorandum of Law at pp. 9–10.

ized claim of possible irreparable prejudice because, conceivably, documents may be missing, in view of the unexplained delay of over five years in moving for the suppression and return of the seized records. Nevertheless, should defendant discover or reasonably believe that any particular document or group of documents have disappeared from the files and were used by the prosecution, the matter can receive the Court's attention in whatever context such a supposititious circumstance might arise. For the moment, it can be said that defendant has failed to make a sufficient showing under Rule 41(d) to justify granting the relief requested.

As an alternative basis for his inventory motion, defendant contends that identification of all of the records originally seized, through an inventory, is constitutionally compelled under the Fourth, Fifth and Sixth Amendments. There are several thrusts to his arguments.

We consider, first, defendant's assertion that identification is necessary because the Government is constitutionally required to make available to defendant all of the evidence unlawfully seized. The gist of this contention seems to be that, if the Government cannot presently produce every single document originally seized, the Court must rule, as a matter of law, that the Government cannot meet its burden of proving the independent origin of its trial evidence. We discern no basis in logic or precedent for such a conclusion. Indeed, the decision in United States v. Coplon, 185 F.2d 629, 28 A.L.R.2d 1041 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1951), relied upon by defendant seems to point to a contrary conclusion.

In that case, recordings and reports obtained through unlawful wiretaps were introduced by the Government to disprove taint. On motion of the Government, however, the Court refused to permit the defense to examine some of the recordings and reports on the ground that their disclosure might be dangerous to "national security." Thus, the case against Coplon was held to be uncontaminated, in part, on the basis of evidence which the defendant was not permitted to see. Finding a patent denial of defendant's rights under the Sixth Amendment, the Court of Appeals reversed.[9] Quite clearly, the point involved is sharply distinguishable from the proposition asserted here.

Another aspect of the *Coplon* decision is direct contrary authority on the ruling sought by the defendant here—that he cannot be tried unless all of the seized evidence is made available. There, some of the original recordings and notes of unlawfully tapped conversations had been destroyed by the New York office of the Federal Bureau of Investigation after weekly reports, summarizing significant information, had been sent to Washington. The defendant asked the Court—"in accord with the canon *contra spoliatorem*"—to infer that the recordings and notes so destroyed led to some of the trial evidence. Observing that there was an innocent explanation for their destruction—namely, the desire of every office to "rid itself of useless litter the substance of which has been preserved"—and that there was no reason to believe that the originals would have shown anything different from the weekly reports, the Court concluded that an inference of taint would not be justified. Thus, the clear implication of this aspect of the *Coplon* case is that the question of taint is one of fact to be determined by the Court on the basis of the evidence introduced on this issue. No basis in reason or authority exists for ruling as a matter of constitutional law that the Government cannot proceed unless it can guarantee that all of the original seized evidence has been made available to the defense.

The two other constitutionally-based contentions made by defendant are close-

---

9. This aspect of *Coplon* was approved by the Supreme Court in Dennis v. United States, 384 U.S. 855, 873 n. 20, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

ly related to the first. Defendant asserts that, absent identification of all of the seized property through ' an inventory, this Court's suppression order must run against all proof offered by the Government. He also argues that identification through an inventory is imperative because the Court is constitutionally compelled to make a detail-by-detail comparison of the seized evidence and the trial evidence to determine whether the Government's case is uncontaminated.

To the extent that either of these propositions is based on the notion that no similarity between the suppressed evidence and the trial evidence may be tolerated, the contention is erroneous as a matter of law.[10] The question of taint involves a determination of "derivation," not of "similarity." In some cases the latter is probative of the former, but this is a matter which can be judged only on the basis of an evidentiary record. There is no justification for ruling as a matter of law that the Government will not be able to establish the independent origin of its evidence.

Finally, the Court dismisses out-of-hand defendant's intimation upon oral argument that the Government's free access to this large collection of unlawfully seized records, over a considerable period of time, should immunize the defendant from criminal prosecution. By failing to give a *Miranda* warning,[11] the Government may be barred from using an uncoerced confession, describing in detail the facts of a crime; yet, if it has independent proof of that crime, it can prosecute the offender to the full extent of the law. Likewise, the fact that the Government may have "bathed" in the illegally seized evidence would not preclude it from prosecuting the defendant on the basis of completely independent, untainted evidence. "A criminal prosecution is more than a game in which the government may be checkmated and the game lost merely because its officers have not played according to rule." McGuire v. United States, 273 U.S. 95, 99, 47 S.Ct. 259, 260, 71 L.Ed. 556 (1927).

Upon the Government rests the substantial burden—the consequence of its own iniquity—of establishing the untainted character of its trial evidence.[12] But whether the sheer magnitude of material illegally seized, the Government's

---

10. In Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), it was said:
"facts improperly obtained do not 'become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it' simply because it is used derivatively." 308 U.S. at 341, 60 S.Ct. at 268, quoting from Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). See also Wong Sun v. United States, 371 U.S. 471, 487–488, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

11. Miranda v. State of Arizona, 384 U.S. 436, 469, 473, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

12. See, e. g., United States v. Tane, 329 F.2d 848, 853 (2d Cir. 1964); United States v. Coplon, 185 F.2d 629, 636, 28 A.L.R.2d 1041 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952); United States v. Goldstein, 120 F.2d 485 (2d Cir. 1941), aff'd, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942); United States ex rel. Laino v.

Warden of Wallkill Prison, 246 F.Supp. 72, 84 (S.D.N.Y.1965), aff'd, 355 F.2d 208 (2d Cir. 1966). In Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed. 678 (1964), involving a federal prosecution following a state grant of immunity, this line of authority received the approval of the Supreme Court.
The Court observed that, once the defendant demonstrates that he testified under a grant of immunity: "the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." 378 U.S. at 79 n. 18, 84 S.Ct. at 1609. Likewise, Justice White in his concurring opinion noted that:
"in the analogous search and seizure and wiretap cases * * * the burden of proof is on the Government once the defendant establishes the unlawful search or wiretap [citing Coplon and Goldstein] * * * to show that its evidence is not tainted by establishing that it had an independent, legitimate source for the disputed evidence." 378 U.S. at 103, 84 S.Ct. at 1616.

access to that material, or the possibility that individual documents are now missing, may handicap the Government in demonstrating the completely independent origin and stainless character of its case is an issue that must await the proofs.

The albatross of the illegal seizure hangs heavily around the Government's neck. But eternal damnation is not the ineluctable fate of the Government's case. The Government may free itself of the albatross by manifesting the immaculate genesis and evolution of its trial evidence.[13]

■ Defendant's present motion for an inventory is hereby denied. This denial is subject to the following ruling: if, at any time during the course of the entire proceedings before this Court it should appear that—in the interest of fairness and justice—further information should be elicited from the Government with respect to any document or group of documents, the Court can and will *sua sponte* or upon appropriate motion take such steps as circumstances warrant. The Court cannot now anticipate all possible contingencies in this intricate litigation. The responsibility of protecting both the Government's and the defendant's rights is a continuing one. The Court's power may be invoked as the changing vicissitudes require. Cf. United States v. Simon, 373 F.2d 649, 654 (2d Cir. 1967).

## II. THE MOTION FOR A PRETRIAL EVIDENTIAL HEARING

Defendant also moves for a pretrial evidential hearing to probe the genesis and evolution of the Government's prospective trial proof. It is defendant's declared objective to utilize the pretrial hearing as the occasion when the Government must prove beyond a reasonable doubt that its proposed trial evidence is uncontaminated by the suppressed records and any clues or leads derived therefrom.

The search and seizure already having been invalidated, the Government concedes arguendo that an evidential hearing will have to be conducted at some time in the course of the proceedings to determine the constitutional purity of its proof against defendant. The issue now squarely before the Court concerns the time when the hearing should be held. Should it be held before, during, or after trial?

■ For the reasons which follow, the Court has concluded that the hearing should be conducted after the jury's verdict, assuming defendant shall have been found guilty. If defendant shall have been acquitted, the need for a hearing will have become moot.

The Court believes it possesses broad discretion in fixing the time for such a hearing. While defendant argues that—under Fed.R.Crim.P. Rule 12(b) (1) and (4) and Rule 41(e)—the hearing may be held only before or during the trial, the Government reads Rule 41(e) to cover specifically the possibility of a post-trial

---

13. With respect to the magnitude of the Government's burden of proof, reference should be made to this Court's opinion in United States v. Pappadio, 235 F.Supp. 887 (S.D.N.Y.1964), aff'd, 346 F.2d 5 (2d Cir. 1965) (prosecution following grant of immunity), wherein it is stated that:

"[t]he burden would be on the Government to prove, *clearly and convincingly*, that all of its proof is derived from sources completely independent of the witness' grand jury testimony, and any clues or leads derived from such testimony." 235 F.Supp. at 890. (Emphasis added.)

If the Government is unable to establish the independent origin of all of its evidence, we might then be faced with the question of whether the constitutional error was prejudicial. See Chapman v. State of California, 386 U.S. 18, 22, 44 n. 2, 52 n. 7, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Whether admission of evidence in violation of the Fourth Amendment can ever be "harmless" was not reached in *Chapman,* nor in Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), decided the same day, wherein this particular issue was raised.

hearing. In the Court's view, neither approach is correct.

As a theoretical matter, the hearing envisaged on this motion is designed to insure that an unbridgeable constitutional gap exists between the trial proof and the suppressed evidence. A careful reading of Rule 41, the search and seizure provision, fails, however, to suggest any explicit basis there for the proposed hearing.

Arguably, the motion falls within the omnibus provision of Rule 12(b) (1) under which any "objection * * * capable of determination without the trial of the general issue" may be raised before trial. If so, the purity of the Government's proof being a question for the Court, the issue may be determined "with or without a jury or on affidavits or in such other manner as the court may direct." Fed.R.Crim.P. 12(b) (4).

Yet the wording of Rule 12 and the related Advisory Committee note suggest that its intended scope does not go beyond defenses and objections previously raised by way of demurrers, special pleas in bar and motions to quash. In contrast, the objection raised by the present motion actually goes to questions of admissibility of evidence and the propriety of lines of inquiry. An analogous problem is faced following an unlawful wiretapping or a grant of immunity. In the Court's view, the question of the timing of a hearing on the issue of taint falls within the "well-established range of judicial discretion" entrusted to federal trial judges "in ruling upon preliminary questions of fact." Nardone v. United States, 308 U.S. 338, 342, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939).

Where the circumstances are not complicated, the question of taint commonly may be disposed of during trial through little more than a brief voir dire of the witnesses. But there are occasions when circumstances demand a separate hearing before or after trial. Compare United States v. Coplon, 88 F.Supp. 921 (S.D. N.Y.1950), with United States v. Pardo-Bolland, 229 F.Supp. 473, 475 (S.D.N.Y. 1964) and Record, pp. 1466–71, 2051–52, United States v. Agueci, 61 Cr. 527, S.D. N.Y., 1961, aff'd, 310 F.2d 817, 834, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

In the exercise of the Court's discretion, the primary desideratum should be the common interest of the Court and the litigants in a fair and expeditious trial. Opposing counsel agree, and the Court concurs, that in the circumstances of this case the hearing on the issue of taint should not be held at or during the trial-in-chief, the reason being that it might divert or confuse the jurors,[14] necessitate numerous adjournments, or otherwise prejudice the prosecution or defense. "The collateral issue of the admissibility of the Government's evidence would swallow up the issue of the defendant's innocence or guilt." (Defendant's Memorandum of Law p. 11.)

As might be expected, however, the Government vigorously opposes defendant's request that the hearing be held in advance of the trial on the merits. Balancing all of the relevant factors, the Court is persuaded by the Government's argument.

In his brief, defendant cites but two reasons for holding the hearing on the issue of taint before trial: (1) "This seems to be the approach uniformly followed" [citing only United States v. Coplon, 88 F.Supp. 921 (S.D.N.Y. 1950)]; and (2) "the orderly administration of justice so requires." (Defendant's Memorandum of Law pp. 11–12.) Elaborating upon this latter conclusion only slightly at oral argument, defendant asserted that a pretrial hearing would enhance the probability of preventing even a slight amount of tainted evidence

14. One district court has recently noted that if the suppression hearing is held at the trial-in-chief, in the presence of the jury, the defendant may be impermissibly coerced into waiving his Fifth Amendment privilege to support his Fourth Amendment contention. United States v. Blalock, 253 F.Supp. 860, 863 (E.D.Pa. 1966).

from finding its way into the Government's proof. (Record of argument, March 14, 1967, p. 166.)

In contrast, the Government cites a number of persuasive, concrete reasons for postponing any such hearing until after a jury verdict. To begin with, defendant has indicated that the special hearing envisaged is likely to be of considerably longer duration than the prospective trial on the merits. Inasmuch as the need for a hearing will be obviated entirely if defendant is acquitted, a substantial saving of time may result if the hearing is postponed until after trial. While defendant insists that the Court need not be so generous with respect to his convenience,[15] some consideration must be given to the desirability of economizing judicial time and to the Government's interest in expediting the proceeding.

Additional factors must be evaluated; and these supply sound reasons for believing that a pretrial hearing would not definitively resolve the issue of taint. The Court has been impressed by the Government's representations that a substantial portion of its trial evidence will be testimonial rather than documentary and that particular witnesses may be drawn from a witness pool of undefined size, as trial strategy dictates. It follows that, at a pretrial hearing, only a largely hypothetical or tentative case could be presented, not fully anticipating the questions actually asked and the answers actually given at trial.

In appraising the realistic feasibility of a pretrial hearing, the Court is confronted by the unassailable circumstance that at such a hearing it would be impossible to probe and ascertain the constitutional purity of the Government's potential cross-examination of defense witnesses (named or unnamed) and of the defendant himself in the supposititious event he took the stand. Those matters must, of necessity, await the trial.

While there still may be some viability to the rule that the Government can employ suppressed evidence in challenging the testimony of defense witnesses as to collateral matters,[16] it is undisputed Supreme Court doctrine that tainted material may not be utilized on cross-examination bearing directly on the question of innocence or guilt. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). The distinction suggests a cautious approach and the avoidance of conjecture about the Government and defense cases.

The scientific theory of games has not matured to the point that a court may predict the witnesses the Government will call in rebuttal to the presently unknown defense case. Were a hearing on the issue of taint to be held in advance of the main trial, it is more than likely that a supplemental hearing would be required either during or after trial, involving some of the same witnesses who had testified at the pretrial hearing or involving the possible linkage of trial exhibits with the seized material. A piecemeal approach to the solution of this problem of taint should be avoided, for it is bound to result in duplicity of questioning and an inordinate expenditure of time. In a real sense it would closely approximate a double trial. On balancing the pros and cons, the Court believes that the more expeditious alter-

15. It may be noted that the defendant is presently out on bail, and has been ably represented in these proceedings by court-appointed counsel.

16. See Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954); United States v. Curry, 358 F.2d 904, 910 (2d Cir.), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966); United States v. Mullings, 364 F.2d 173, 175 n. 2 (2d Cir. 1966); People v. Kulis, 18 N.Y.2d 318, 274 N.Y.S.2d 873, 221 N.E. 2d 541 (1966); People v. Davis, 50 Cal. Rptr. 215, 218 (Dist.Ct. of App.1966). But see Miranda v. State of Arizona, 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (dictum); People v. Kulis, 18 N.Y.2d 318, 323–24, 274 N.Y.S.2d 873, 875–876, 221 N.E.2d 541 (1966) (dissenting opinion of Keating, J.); United States v. Armetta, 378 F.2d 658 (2d Cir. May 4, 1967).

native is to postpone the entire inquiry into the issue of taint, if needed, until after a jury verdict. At that time, the Government's actual trial evidence will have been made completely a matter of record and a searching probe into the genesis and evolution of the proof could be conducted with a minimum of confusion, repetition and delay.

Apart from the practical desiderata already adverted to, the Government contends that a pretrial hearing of the scope desired by defendant would unavoidably amount to a comprehensive and unrestricted preview of the Government's entire case. While recognizing that the discovery rules in federal criminal cases were revised and liberalized in July, 1966,[17] the Government submits that the kind of unqualified disclosure which would be provided here, were defendant's motion granted, was considered and rejected by those who formulated and approved the recent amendments.

Defendant's counterargument—that a pretrial hearing would only amount to rough justice in light of the Government's inspection of the unlawfully seized records—induces a first reaction of sympathy. Upon a reflective appraisal of all factors, however, the Court is disinclined to expand the scope of discovery authorized by the recently revised rules in the absence of a compelling necessity dictated by the need to protect the substantial rights of defendant in a situation where such protection cannot otherwise be effectively supplied. This case does not fall within that exception. Defendant's right to be tried solely on the basis of constitutionally pure evidence can and will be vindicated more effectively at a post-trial hearing than at a pretrial hearing.[18]

Another practical element must be taken into consideration. This case will probably attract extensive publicity, as it did in its earlier stages. Public exposure of any inculpatory proof against defendant and other potentially damaging evidence at a pretrial hearing may prejudice defendant's right to a fair trial. Cf. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Pretrial publicity may create a problem in the selection of unbiased jurors, which may in turn prompt defendant to request continuances or a change of venue. Postponement of the hearing on the issue of taint until after trial would minimize the risk of prejudice, and avert the possibility of further delay.

17. Rule 16 of the Federal Rules of Criminal Procedure, governing discovery and inspection, was substantially revised effective July 1, 1966. The lengthy note of the Advisory Committee describing the expanded scope of pretrial discovery contains an excellent bibliography of recent legal literature on the subject.

Effective the same date, Rule 17.1—allowing for pretrial conferences in criminal cases—was added to the rules.

18. There have been some doubts expressed in decisions of the Court of Appeals for the District of Columbia whether a defendant's right to be tried on the basis of untainted evidence can be adequately protected at a post-trial hearing. In these cases no suppression hearing of any kind had been held prior to trial. See Battle v. United States, 120 U.S.App.D.C. 221, 345 F.2d 438 (1965); Henderson v. United States, 121 U.S.App.D.C. 277, 349 F.2d 712 (1965) (dissenting opinion of Bazelon, C. J.). Cf. O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967); Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966).

In *Henderson*, Chief Judge Bazelon asserted in his dissenting opinion that:

"Where the sitting judge knows that his determination will sustain or vacate an otherwise valid conviction and, as here, the evidence which may or may not be suppressed makes guilt plain, I think it unrealistic to assume that inquiry will be made with as much care and objectivity as would precede trial." 349 F.2d at 713.

The short answer to this contention is that the defendant is subject to a similar supposititious risk of prejudice if the hearing is held before trial. For if evidence which "makes guilt plain" is presented to the judge at a pretrial hearing, his "objectivity" is just as likely to be impaired at the trial-in-chief itself, whether he is finding the facts, or making discretionary rulings on the admissibility of evidence and instructing the jury.

The Court has noted the Government's reiterated statements of intention: that it does not propose to rely upon tainted evidence or any clues or leads derived therefrom and that it will amply demonstrate the constitutionally unblemished character of its trial proof. The prosecuting attorney's clear consciousness of this sharply focused issue has been heightened by defense counsel's blunt and insistent challenge. The Court has discerned no reason to doubt the sincerity of the prosecuting attorney's pledge that he will satisfy scrupulously all constitutional criteria.[19]

The Court hereby denies defendant's motion for a pretrial hearing, as well as defendant's motion for an inventory. So ordered.

---

19. See, e. g., United States v. Stonehill, 254 F.Supp. 1003, 1005 (S.D.N.Y.1966); United States v. Kenner, 36 F.R.D. 391, 394 (S.D.N.Y.1965); United States v. Epstein, 240 F.Supp. 84, 86 (S.D.N.Y.1965); United States v. Frankfeld, 100 F.Supp. 934, 935-936, 938 (D.Md.1951); Record, pp. 1483-85, United States v. Agueci, 61 Cr. 527, S.D.N.Y., 1961, aff'd, 310 F.2d 817 (2d Cir. 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013 (1963). Cf. Lawn v. United States, 355 U.S. 339, 348-349, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).